The **CITY OF NEW YORK**, Plaintiff,

v.

**EXXON CORPORATION, et al., Defendants.**

**No. 85 Civ. 1939 (KC).**

United States District Court, S.D. New York.

Sept. 29, 1988.

---

Peter Lehner, New York City Law Dept., New York City, for plaintiff.

Michael M. Gordon, Cadwalader, Wickersham & Taft, New York City, for Exxon Corp. and Exxon Research & Eng. Co.

Marvin Katz, New York City, for Chrysler Corp.

Thomas P. McCaffey, New York City, for United Tech. & Carrier Corp.

Arthur Schmauder, Shanley & Fisher, P.C., New York City, for BASF Wyandotte Corp.

K. Dennis Sisk, Hunton & Williams, New York City, for Dana Corp., Public Service Elec. & Gas Co., Borg-Warner Corp.

Dennis M. Reznick, McElroy, Deutsch & Mulvaney, New York City, for Ingersoll-Rand Corp.

Eric M. Wagner, Cole & Deitz, New York City, for Refinement Intern.

Alan H. McLean, Hughes, Hubbard & Reed, New York City, for Nat. Can Corp.

Jeffrey G. Miller, Verner, Liipfert, Bernhard, McPherson and Hand, Washington, D.C., for Koppers Co., Inc.

Sidley and Austin, New York City, for Alcan Aluminum.

Breed, Abbott and Morgan, New York City, for Ford Motor Co.

## OPINION

CONBOY, District Judge:

The City of New York ("the City") commenced this action in March of 1985 under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.[1], together with various state law claims. According to the complaint, the fifteen corporate defendants named therein generated hazardous industrial and chemical wastes that were ultimately disposed of at five City landfills. The wastes were transported to the landfills by certain waste-hauling companies owned or operated by Russell Mahler. Mahler gained access to the City landfills for the purpose of dumping the defendants' wastes by bribing an employee of the City's Department of Sanitation.[2]

---

1. The original complaint tracked the language of CERCLA § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), which is applicable to governmental plaintiffs seeking recovery of response costs incurred in connection with hazardous waste sites, but inadvertently cited § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), which applies to private plaintiffs. In April of 1986, the City amended its complaint to assert alternative claims under both sections. The City also seeks recovery for natural resource damages pursuant to § 107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C).

2. The facts underlying this action are set forth in greater detail in *City of New York v. Exxon*, 633 F.Supp. 609 (S.D.N.Y.1986).

The City now seeks (i) recovery of the costs incurred to date for evaluating the nature and extent of chemical contamination at the five sites and for emergency measures undertaken to control off-site migration of hazardous substances; (ii) a declaratory judgment that defendants are liable for the future costs of investigations and remedial actions at the sites; and (iii) damages for injury to natural resources caused by defendants' wastes.

In August of 1986, the original defendants filed their answers, which included counterclaims against the City under CERCLA and common law, and also filed three separate third-party complaints against more than 300 additional parties. On January 23, 1987, the Court severed and stayed the third-party actions pending the outcome of the main action. On September 29, 1987, the Court, at the request of thirteen of the fifteen original defendants, further streamlined the case by dividing it into three phases. In the first phase, issues of liability would be determined. If necessary, the Court would then consider remedies and damages following the completion of the City's plans for closure of the five landfills.[3] In the last phase, the Court would allocate liability and damages. The late honorable Edward Weinfeld severed and stayed the third-party actions because, among other reasons, he anticipated that a settlement between some or all of the original parties might lead to the amicable disposition of the entire case.

A proposed settlement is now before the Court. On May 25, the City and defendants American National Can Corporation, BASF Corporation, Borg–Warner Corporation, Dana Corporation, Ford Motor Company, Koppers Company, Inc., and Public Service Electric and Gas Company ("the settling companies" or "the settling defendants") moved for the entry of Judgment on Consent ("the Judgment"). The Judgment provides that, within ten days of its entry, the settling companies will deliver to the City a Landfills Remedial Fund Agreement ("the Agreement") executed by and binding upon CNA Insurance Company ("CNA"). Pursuant to the Agreement, CNA will pay to the City the sum of twelve million five hundred fifty-five thousand dollars in five installments over a period of six years. All monies paid to the City pursuant to the Agreement are to be used by the City for removal, remedial, and response costs incurred in connection with the landfills. In addition to the monies paid directly to the City, the settling companies will pay $1,243,492.00 into a Natural Resource Trust Fund ("NRT Fund") to be established and administered by NYSDEC. Monies paid into the NRT Fund are to be used for assessing any remedying damage to natural resources resulting from the release of hazardous substances from the landfills.

Upon fulfillment by the settling companies of their obligations described above, the Judgment provides that the City's claims against the settling companies are dismissed with prejudice and the City releases the settling companies, and certain additional companies, from liability for all claims relating to the landfills. In turn, the settling companies' counterclaims against the City, as well their claims against any of the remaining parties, including third-party actions, are dismissed. Thus, the Judgment will completely resolve and terminate this litigation as to the settling companies.

Although not a party to this action, New York State, through NYSDEC, participated in the negotiations that led to the proposed settlement, and the obligations assumed by the settling defendants' under the Judgment will discharge their liability to both the City and the State. Nonetheless, NYSDEC and the settling companies have executed a separate Order on Consent (or "Consent Order") to formalize their agree-

---

**3.** The five City landfills have been classified by the New York State Department of Environmental Conservation ("NYSDEC") as "inactive hazardous waste sites," and the City and the State are currently formulating plans for their clo-

sure. See the Affidavit of Philip Gleason, Director of Landfills Engineering in the New York City Department of Sanitation, dated July 13, 1987.

ment.[4] The effectiveness of the Order on Consent is conditioned on the Court's approval of the Judgment and is incorporated therein by reference.

Two of the eight remaining original defendants and twelve of the approximately 350 third-party defendants have opposed the proposed Judgment. The substance of their opposition is set forth in the memoranda of law of original defendants Exxon Corporation and Exxon Research and Engineering Company, Inc. ("Exxon") and third-party defendant Clairol, Incorporated ("Clairol"). Exxon takes exception to Section 3, Paragraph 4 of the Judgment which provides that the Judgment "shall constitute the resolution of liability to a State ... within the meaning of Section 113(f)(2) of CERCLA." Settlement pursuant to Section 113(f)(2), 42 U.S.C. § 9613(f)(2), which on its face governs only settlements by "the United States or a State," may subject non-settling CERCLA defendants to a disproportionate share of liability from which they would otherwise be protected, and may also subject them to contribution actions by settling defendants which might otherwise be barred.[5] Consequently, Exxon contends that the issue of whether the City is a "State" within the meaning of section 113 should be resolved before the Court approves the Judgment.

As Exxon points out, a nearly identical issue is raised in its pending motion for summary judgment. The complaint asserts claims, in the alternative, under CERCLA sections 107(a)(4)(A) and 107(a)(4)(B), which impose liability on certain statutorily defined responsible persons for, respectively:

(A) all costs of removal or remedial action incurred by the *United States Government* or a *State* or an Indian Tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by *any other person* consistent with the national contingency plan;

(emphasis added). In its pending motion, Exxon argues, *inter alia*, that the City lacks the capacity to proceed as a "State" under § 107(a)(4)(A). Exxon suggests that the Court reserve decision on the proposed Judgment until the Court determines the City's right to assume the role of the State in the context of the pending summary judgment motion. Without citing any specific deficiency, Exxon also contends that the settling parties have not presented a factual record sufficient to justify approval of the settlement.

Clairol is equally concerned with the settlement's impact on contribution rights and apportionment of liability, but Clairol's interpretation of the Judgment differs from Exxon's. Specifically, Clairol does not object to the Judgment in so far as it resolves the City's claims against the settling companies. Apparently ignoring Section 3, Paragraph 4 of the Judgment, Clairol states that the resolution of the City's claims against the settling companies "does not adversely affect the right of Clairol or any other person and, therefore, no one but the City and the Settling Defendants has any interest in it." Memorandum in Opposition to Motion for Entry of Judgment on Consent at 2. Clairol's demurrer is limited

---

**4.** Two weeks before the City and the settling defendants filed the instant motion, NYSDEC filed an administrative claim against the settling defendants, apparently to set the stage for the execution of the Consent Order.

**5.** Section 113(f)(2) provides:

A person who has resolved his liability to the *United States or a State* in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others *by the amount of the settlement.*

(emphasis added). Furthermore, if a party settles with "a State" pursuant to 113(f)(2), that party "may seek contribution from any person who is not a party to [the] settlement." § 113(f)(3)(B), 42 U.S.C. § 9613(f)(3)(B).

These provisions place non-settling CERCLA defendants at a disadvantage in two ways. First, it leaves them open to contribution claims from settling defendants who have paid more than their proportionate share of liability. Second, if settling defendants have paid *less* than their proportionate share of liability, section 113(f)(2) apparently compels the non-settlers to absorb the shortfall.

to that portion of the Judgment which incorporates the Consent Order between the State and the settling companies. According to Clairol, "the purpose and effect of the proposed consent judgment which incorporates the agreement between the Settling Defendants and the State is to provide the Settling Defendants with the benefits of section 113(f)(2) of" CERCLA. *Id.*[6] Because, Clairol asserts, it would be improper to afford judicial approval to claims that have never been asserted before the Court, Clairol insists that the portion of the Judgment which incorporates the Consent Order should be severed, or, in the alternative, that the State be required to file a motion, on notice, for leave to intervene in this action. If granted, Clairol further argues that the Consent Order must be reviewed in the context of a full hearing, on notice, to determine if it is fair and reasonable. Last, Clairol contends that all interested parties should be afforded an opportunity to conduct discovery in preparation for that hearing.

## ANALYSIS

■ In response to Clairol's and Exxon's objections, several of the settling parties have argued that a ruling on the applicability of section 113(f)(2) to the settlement would be premature. Frankly, this position is somewhat surprising since it is the proposed Judgment and Consent Orders' references to section 113(f)(2) which has inspired Exxon's and Clairol's objections in the first place. The non-settling parties' fear, not without justification, that the approved Judgment will at some point be invoked as a conclusive ruling on the applicability of section 113(f)(2) to the settlement. If the only issue before the Court is, as the settlers assert, the adequacy, fairness, and reasonableness of the payment terms of the Judgment, they have certainly sent mixed signals to the Court and to the other litigants in the way they have structured the settlement. Nonetheless, the arguments for avoiding a ruling on contribution and apportionment issues are not frivolous and they will be addressed.

As the settling parties have pointed out, the Case Management Order, which was entered with Exxon's consent, provides that the "[a]llocation of liability and damages, if any, will be adjudicated *following* the adjudication of issues related to landfill remedies and damages." (emphasis added).[7] Apart from the planned, orderly disposition of the action, the settling parties argue that the postponement of contribution issues, both legal and factual, is sensible since intervening events may render the issue moot. Under the most optimistic scenario, the remaining defendants will settle with the City and the State, foreclosing any contribution actions by or against anyone. Alternatively, if the case proceeds against some or all of the remaining defendants, the Court might rule that the non-settling defendants are simply not liable to the City, thus foreclosing any contribution actions by or against them. Finally, even if some or all of the remaining defendants are found liable, a ruling on the contribution protection available to the settling parties with respect to the CERCLA claims will still leave open questions about contribution and apportionment of liability. For example, if the remaining defendants are held liable under state law only or under both state law and CERCLA, the Court may have to determine whether state rules of contribution and apportionment apply to the claims. Hence, the settlers argue, a ruling on these issues would be premature, and, in light of their willingness to proceed without assurances that section 113(f)(2) applies to the settlement, apparently unnecessary.[8]

---

6. Each of the agreements at issue here, the Judgment and the Consent Order, states that it constitutes "the resolution of liability to a State in an administrative or judicially approved settlement within the meaning of Section 113(f)(2) of CERCLA." Judgment Section 3, Paragraph 4; Consent Order Paragraph 5.

7. Issues of allocation are unlikely to be addressed, if at all, until well into the 1990s. See the affidavit of Philip Gleason in support of the Motion for Entry of the Case Management Order.

8. Exxon's concern that it will be prejudiced by section 113(f)(2)'s provision allowing settlers to retain contribution rights is purely academic

■ While these arguments are appealing, a determination of the settlement's status under 113(f)(2) will have an immediate impact, as a practical matter, on all of the parties. Although it is true that contribution and apportionment issues will not in all likelihood be resolved, if at all, for several years, section 113(f)(2)'s application to the settlement would guarantee the settling companies that they would not be dragged back into the case should it proceed that far. The remaining defendants, on the other hand, would immediately be confronted with the prospect of covering any shortfall between what the settlers paid and what they would have paid had they remained in the case. *See* Note, Superfund Settlements: The Failed Promise of the 1986 Amendments, 74 U.Va.L.Rev. 123, 142 (1988). Under alternative contribution frameworks, the City's recovery against the remaining defendants would likely be reduced by at least the settling parties' proportionate share of fault if it turns out to be greater than the settlement amount.[9] Although, as discussed above, contribution and apportionment issues may never ripen, and will not in any event be addressed until the last phase of the case, a ruling on section 113(f)(2)'s application to this case would certainly have a substantial bearing on the remaining defendants' litigation strategy, particularly with respect to settlement. For these reasons, the

Court will address the merits of this question and resolve it.[10]

a) The City's Standing Under §§ 107(a)(4)(A) and 113(f)(2).

■ In its motion for summary judgment, Exxon offers three arguments in support of its view that the City cannot proceed as a "State" under § 107(a)(4)(A) of CERCLA: (1) the express language of the section precludes municipalities from proceeding thereunder (2) the structure of the Act demonstrates a clear intent to divide duties and rights among the United States, the states, and other persons including municipalities, and (3) the legislative history supports a narrow, literal reading of section 107. These arguments apply with equal force to section 113(f)(2) and they will be so considered.

The first of these three arguments—that the meaning of the language is plain and, therefore, the Court should not look beyond the four corners of the statute to interpret it—is the strongest. As already noted, § 113(f)(2) refers only to settlements involving the "United States Government or a State." It is axiomatic that the interpretation of a statute must begin with the language of the statute itself, *Touche Ross v. Redington*, 442 U.S. 560, 566, 99 S.Ct. 2479, 2884, 61 L.Ed.2d 82 (1979); *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed.2d 442 (1917), and,

since the Judgment provides for the dismissal of the settling companies' claims against the remaining parties.

**9.** Several courts have held that the Uniform Comparative Fault Act ("UCFA"), pursuant to which the claim of the releasing person is reduced by released person's equitable share of fault, is the contribution framework best suited to CERCLA cases. *See Lyncott Corp. v. Chemical Waste Management, Inc.*, 690 F.Supp. 1409 (E.D.Pa.1988); *Hines Lumber Co. v. Vulcan Materials Co.*, No. 85 C. 1142 (N.D.Ill. Dec. 4, 1987) [available on WESTLAW, 1987 WL 27368]; *United States v. Conservation Chemical Co.*, 628 F.Supp. 391, 400 (W.D.Mo.1985). *Conservation Chemical*, an action commenced by the United States, was decided before the effective date of the Superfund Amendments and Reauthorization Act of 1986, (P.L. 99–499) ("SARA") which, among other things, added section 113(f)(2) to CERCLA. *Lyncott* and *Hines Lumber*, both in-

volving private plaintiffs, were decided after the effective date of SARA.

If New York General Obligations Law § 15–108 were deemed applicable, the releasing person's claim would be reduced by the *greater* of (1) the settling defendants' share of liability or (2) the settlement amount. Furthermore, under both the Uniform Comparative Fault Act and New York law, the settling defendants would *not* be entitled to seek contribution for any excess paid beyond their proportionate share of liability. UCFA § 4; NYGOL § 15–108.

**10.** It is unnecessary to await the development of "a complete factual record" on the pending summary judgment motion as Exxon suggests. Whether a city or other political subdivision of a state can proceed as a state under sections 107(a)(4)(A) and 113(f)(2) is a question of law. The 6 pages of Exxon's 159 page summary judgment motion devoted to the question is bereft of any reference to the "factual record."

ordinarily, a court must assume that Congress expressed its purpose through the ordinary meaning of the words it used. *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984). Accordingly, if the text of section 113 were the only source of its meaning, Exxon's restrictive interpretation of § 113 would be highly persuasive.[11] But, as Exxon points out, Congress has supplied definitions of the statutory terms at issue, and those definitions are controlling. *See Conoco, Inc. v. Federal Energy Regulatory Com'n*, 622 F.2d 796, 800 (5th Cir.1980); *see also Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) (*unless otherwise defined* words will be given their ordinary meaning).

CERCLA's statutory definitions are found in section 101. Section 101(27) defines "United States" and "State" to "*include* the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jurisdiction" (emphasis added). Section 101(21) provides that " 'person' *means* an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, *municipality*, commission, political subdivision of a State, or any interstate body" (emphasis added). Contrasting the exclusion of municipalities from the definition of "United States" and "State" with their inclusion in the definition of "person," Exxon asserts that Congress must have intended to limit enforcement actions by municipalities to § 107(a)(4)(B), which refers to actions by "any other person" (other than the United States or a State), and, by extension, to deny the benefits of 113(f)(2) to parties settling with municipal plaintiffs. The Court cannot agree.

First, Exxon's reliance on the maxim "expressio unius est exclusio alterius"—the expression of one thing is the exclusion of another—would be justified if section 101(27) defined "State" to *mean* the various enumerated entities. *See Colautti v. Franklin*, 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 684 n. 10, 58 L.Ed.2d 596 (1979) (definition that declares what term "means" excludes any meaning not stated). Instead, "State" is defined to *include* the entities on the illustrative list. In construing CERCLA section 107(a)(4)(A) to permit enforcement actions by municipalities, the court in *Mayor and Board of Alderman v. Drew Chemical Corp.*, 621 F.Supp. 663, 666 (D.C.N.J.1985), observed:

A term whose statutory definition declares what it 'includes' is more susceptible to extension of meaning by construction than where the definition declares what a term 'means.' It has been said 'the word includes is usually a term of enlargement, and not of limitation.... It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated....'

(quoting Singer, 24 Statutes and Statutory Construction § 47.07 (4th Ed.1984)). *See also Pfizer Inc. v. Government of India*, 434 U.S. 308, 312 n. 9, 98 S.Ct. 584, 587 n. 9, 54 L.Ed.2d 563 (1978). The Court likewise interprets the statutory definition of "State" to invite inclusion of entities not specifically enumerated.

Moreover, contrary to Exxon's analysis, the conclusion that Congress intentionally used the word "includes" to indicate enlargement is strengthened, rather than weakened, by comparison with the definition of "person" in § 101(21). There, Congress defined "person" to *mean* the various entities listed. " '[W]here Congress includes particular language in one section of a statute but omits it in another section of

11. Though not necessarily conclusive. The "[m]ere incantation of the plain meaning rule ... cannot substitute for meaningful analysis," *Shippers National Freight Claim Council v. I.C.C.*, 712 F.2d 740, 747 (2d Cir.1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984), and "the plain meaning doctrine has always been considered subservient to a truly discernible legislative purpose," *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 106 (D.C.Cir.1976).

the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *see Tayofa v. Department of Justice*, 748 F.2d 1389, 1392–93 (10th Cir.1984) (clear use of different terminology within body of legislation is evidence of intentional differentiation); *Lankford v. Law Enforcement Assistance Administration*, 620 F.2d 35, 36 (4th Cir.1980) (same). To interpret both definitions as being exclusive, as Exxon urges, would render Congress' use of different terminology in each definition meaningless.

On the other hand, the same rule of statutory construction lends some support to Exxon's second argument—that the overall structure of CERCLA demonstrates a clear Congressional intent to divide duties among the United States, States, local governments, and private parties. Political subdivisions are expressly granted rights and roles in some sections and omitted from others, including §§ 107 and 113(f)(2). At a minimum, however, it is clear that political subdivisions are not relegated to the role of private parties under the Act, and in several provisions of CERCLA are afforded powers and duties on par with those given the states. For example, section 104(d), 42 U.S.C. § 9604(d), empowers states or their political subdivisions to enter into clean-up agreements with the EPA on a cost-sharing basis. *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1041 (2d Cir.1985). Private parties have no such power. Other examples include § 111(c)(11), 42 U.S.C. § 9611(c)(11) (authorizing Superfund disbursements to local governments for expenses incurred under section 123 for temporary emergency measures), § 104(i)(15), 42 U.S.C. § 9604(i)(15) (role of Agency for Toxic Substance and Disease Registry to be carried out directly or through agreements with states or their political subdivisions), and § 123(b)(1), 42 U.S.C. § 9623(b)(1) (Superfund may be used to reimburse local governments for costs incurred in carrying out temporary emergency measures). Thus, a broad reading of Sections 113 to encompass municipalities as well as states and the Federal government, is not necessarily inconsistent with the structure of CERCLA.

More important, a broad reading of sections 107(a)(4)(A) and 113(f)(2) is entirely consistent with the overall purpose of the Act. Particularly where, as here, the Act being interpreted "is far from being a model of statutory or syntactic clarity," *Exxon*, 633 F.Supp. at 613–14, it should be enforced " 'in such a manner that its overriding purpose will be achieved, even if the words used leave room for a contrary interpretation.' " *Capitano v. Secretary of Health & Human Services*, 732 F.2d 1066, 1075 (2d Cir.1984) (quoting *Haberman v. Finch*, 418 F.2d 664, 666 (2d Cir.1969)). "CERCLA is essentially a remedial statute designed by Congress to protect and preserve public health and the environment. [Courts] are therefore obligated to construe its provisions liberally to avoid frustration of the beneficial legislative purposes." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074, 1081 (1st Cir.1986); *see also Drew Chemical*, 621 F.Supp. at 668. Since one of the principal purposes of CERCLA is to ensure "that those responsible for problems caused by the disposal of chemical poisons bear the costs and responsibility for remedying the harmful conditions they created," *Dedham*, 805 F.2d at 1081 (quoting *Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1112 (D.C.Minn.1982)), allowing the City to proceed under section 107(a)(4)(A) and settle under section 113(f)(2) would certainly advance the Act's remedial purposes by encouraging early and complete settlements.

Exxon finds its weakest support for a restrictive reading of section 113 in CERCLA's legislative history. As Judge Weinfeld noted, in ruling on defendants' motion to dismiss in this case, "the Committee Reports and other legislative materials regarding CERCLA are *dubious sources for interpretation of the statute, which in its final form reflected legislative judgments which differed substantially from those incorporated in the earlier House and Senate bills*." *Exxon*, 633 F.Supp. at 613–

14 n. 2 (emphasis added). *See also Dedham,* 805 F.2d at 1080 (quoting *United States v. Mottolo,* 605 F.Supp. 898, 902 (D.N.H.1985)) (" 'CERCLA has acquired a well-deserved notoriety for vaguely drafted provisions and an indefinite, if not contradictory, legislative history' "). Apart from the general unreliability of CERCLA's legislative history, the legislative materials offered by Exxon in support of a restrictive interpretation of "State" are simply not persuasive. For example, Exxon notes that a CERCLA predecessor bill, H.R. 85, contained the same definition of "State" found in CERCLA. Since the previous definition also suggests enlargement rather than limitation, it is difficult to see how it bolsters Exxon's interpretation of the statute. Exxon also points out that H.R. 85, like the final version of CERCLA, divided rights between and duties among the United States, states, municipalities, and other persons. But again, in light of H.R. 85's expansive definition of "State" and the remedial purpose of the Act, the legislative history arguably supports an expansive reading of sections 107 and 113. At best, the predecessor bill supports the same competing inferences as the final version of the Act.

Finally, the restrictive interpretation of section 113(f)(2) urged by Exxon would be particularly inappropriate in this case. None of the objecting parties seriously questions the monetary terms of the settlement, and NYSDEC is prepared to place its stamp of approval on the settlement by releasing its CERCLA claims against the settling companies. In effect, the state has expressed its approval of the City's role in this litigation, and the Judgment reflects a comprehensive settlement worked out between the State, the City, and the settlers. To deny the settling parties the statutory benefits of section 113(f)(2) under these circumstances would be unduly formalistic.

b) The Consent Order's Status Under § 113(f)(2).

■ A more difficult question is raised by Clairol's objection to the portion of the proposed Judgment which incorporates the Consent Order between the settling defendants and the State. Before addressing that objection, however, it will be helpful to explain Clairol's position since the settling companies appear either to misunderstand it or mischaracterize it. According to the settling companies, Clairol's objective is to prevent a comprehensive resolution of all of their potential liability to the City and the State for the costs incurred in cleaning up the contaminated landfills.[12] To demonstrate the fallacy of this argument, we need only consider the consequences of severing the Consent Order from the Judgment, but in all other respects leaving the settlement intact.

First, since both the Judgment and the Consent Order set forth all of the settling companies' obligations, the severance of the Consent Order would in no way diminish those obligations. Indeed, in this respect, the effect of the settlement would be the same if the Consent Order did not exist at all. Under the terms of the Judgment, the City would still receive $12,555,000.00 from CNA directly, and the NRT Fund would receive $1,243,492.00.[13] Second, the Judgment, once approved, would operate to release the City's claims against the settling companies and in the Court's view, as discussed above, would provide the settling companies with the benefits of section 113(f)(2). In addition, all claims by or against the settling companies, including counterclaims against the City, would be dismissed, thereby terminating the litigation as to the settling companies. Finally, although no longer incorporated in the Judgment, the Consent Order would operate to release the settling companies from liability to the State for the matters ad-

---

**12.** For example, defendants PSE & G and Dana Corporation assert, in opposition to Clairol's demand that the Consent Order be severed, that they "did not bargain for a partial settlement or agree to pay more than $13.7 million to discharge the claims of the City alone." Reply

Memorandum in Support of Joint Motion for Entry of Judgment on Consent at 13–14.

**13.** If the Consent Order did not exist, NYSDEC would in a sense be a third-party beneficiary of the agreement between the settling defendants and the City.

dressed in the settlement. Furthermore, according to the settling parties, the Consent Order, as an administrative settlement, activates the protections and benefits of section 113(f)(2) with respect to the State's claims regardless of whether the State portion of the settlement receives judicial approval.[14]

Thus, it appears that the incorporation of the Consent Order into the Judgment is superfluous. With or without the Consent Order, the Judgment reflects the comprehensive settlement worked out between the City, the State, and the settling defendants, and, in conjunction with the Consent Order, assures that the settlers will be free from liability to both governments for their role in the contamination of the landfills. If so, the Court must ask why the settlers insist upon the incorporation of the Consent Order in the Judgment?[15]

The logical answer to that question is provided by Clairol:

[I]t is clear, although the joint motion papers do not expressly so state, that the Settling Defendants intend to rely upon this court's approval of the consent judgment resolving a case in which the State is *not* a party to satisfy the requirement of section 113(f)(2) of CERCLA, that their settlement be 'judicially approved,' *thereby immunizing them from any liability for contribution with respect to any proceedings which may someday be brought by the State against any other party* (including, but not limited to the non-settling defendants and the 320 third party defendants).

Memorandum in Opposition to Motion for Entry of Judgment on Consent at 7 (emphasis supplied emphasis added). Should the State proceed against Clairol or any other non-settling parties after the Judgment is approved, Clairol fears that the Court's formal approval of the Consent Order, through its incorporation in the Judgment, will preclude the defendants in a future *State* proceeding from seeking contribution from or impleading the settling defendants. Although the settling companies have argued that as an administrative settlement, the Consent Order is on equal footing with a judicially approved settlement, they have apparently structured the settlement package in such a way as to insure that the Consent Order is *both* an "administrative settlement" and "judicially approved." By approving the settlement package as offered, however, I would also in effect be ruling on the State's right to recover from other potentially liable parties any shortfall between the payments under the Consent Order and the settlers' proportionate share of fault.[16] The question, then, is not simply whether the Court has the power to approve a settlement involving a non-party, but whether the Court can expressly or tacitly affect the legal status of the non-party's claims, or more precisely the legal consequences of the settlement of those claims, by an order of the Court.

To resolve this issue, we begin with the basic proposition that federal district courts "have jurisdiction only over such matters as Congress has validly conferred upon them." 1 J. Moore, Moore's Federal Practice para. 0.60[1] at 604 (2d ed. 1988). "Jurisdiction is power to declare the law," *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1869), and where it does not otherwise exist, neither the litigants nor the Court itself can confer it.

**14.** Defendants American National Can, BASF Corporation, Borg–Warner Corporation, Ford Motor Company, and Koppers Company, Inc., have asserted that "[u]nder the express terms of § 113(f)(2) administrative settlements with a State preclude claims for contribution for all matters addressed in the settlement." Memorandum of Five Settling Defendants at 11. Similarly, the City asserts that the Consent Order constitutes a resolution of liability within the meaning of § 113(f)(2). Reply Memorandum of the City of New York at 34.

**15.** PSE & G and Dana Corporation assert that "[t]o sever the State Settlement is to destroy the whole settlement." Memorandum in Support of Joint Motion for Entry of Judgment on Consent at 14.

**16.** Actually, this would be achieved in two ways. First, as noted above, by the Consent Order appearing to receive separate review and approval. Second, by the incorporation in the Judgment of Paragraph 5 of the Consent Order which expressly declares its status under that section.

See *Green v. Department of Commerce,* 618 F.2d 836, 838–39 (D.C.Cir.1980); *Bishop v. Committee on Professional Ethics,* 686 F.2d 1278, 1284 (8th Cir.1982); *Magalotti v. Ford Motor Co.,* 418 F.Supp. 430, 432 (D.C.Mich.1976). While it is often stated that a federal court must possess jurisdiction over the subject matter of a case and over the persons whose rights are to be affected, *see, e.g., F.T.C. v. Compagnie De Saint-Gobain-Pont-a-Mousson,* 636 F.2d 1300, 1318 (D.C.Cir.1980); *Rankin v. Howard,* 633 F.2d 844, 848 (9th Cir.), *cert. denied,* 451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1980), it is "sometimes overlooked, that an action must [also] be properly commenced before a valid judgment or order can be entered therein." 2 J. Moore, Moore's Federal Practice para. 3.04 at 3–13 (2d Ed.1988). *See Rapoport v. Banco Mexicano Somex, S.A.,* 668 F.2d 667, 670 (2d Cir.1982); *United States v. Black,* 356 F.Supp. 366, 368 (W.D.N.Y.1973); *Minersville Coal Co. v. Anthracite Export Ass'n,* 55 F.R.D. 429, 432 (M.D.Pa.1972); *Warren v. Arzt,* 18 F.R.D. 11, 13 (S.D.N.Y.1955). Obviously, the City has properly commenced this action but the Court's jurisdiction over the City's claims does not give the Court unfettered power to resolve all of the issues and claims arising out of the transactions underlying the lawsuit.

▪ In *Energetics, Inc. v. Allied Bank of Texas,* 784 F.2d 1300 (5th Cir.1986), the defendant bank had taken control of one of its depositor's bank accounts as an offset after the depositor defaulted on certain loans. The plaintiff, Energetics, Inc., was a third-party who claimed that the account contained money held in trust by the depositor, Republic Drilling & Service, Inc., for Energetic's benefit and was, therefore, not subject to offset by the bank. The district court ordered the bank to turn the money over to Energetics, but the court also held that Republic's trustee in bankruptcy was entitled to a portion of the funds equal to an amount that Energetics owed to Republic. On appeal, the circuit court affirmed the judgment in favor of Energetics (though the sum was reduced) but reversed the award to the trustee:

> The trustee in bankruptcy of Republic is not a party to this case. It is obvious that the district judge was attempting to achieve a just result by awarding the entire [account balance] to Energetics and then requiring that $176,797.94 of that judgment be paid by Energetics to the Republic trustee if the trustee made a claim for it against Energetics. The district court's judgment is invalid, however, because it awards a judgment which is partially for the benefit of a party not before the court. The judge has no power to award relief to the trustee in bankruptcy of Republic against a debt owed by the bank when the trustee is not before the court.... Our case is between Allied and Energetics. We have no authority to deal with a claim a third party may have against the bank. We can only dispose of and we do dispose of the claims which exist between the parties before us.

*Id.* at 1305 (citations omitted). *See also SEC v. Investors Security Leasing Corp.,* 560 F.2d 561, 568 (3d Cir.1977). This court is also constrained to dispose of only those claims which exist between the parties before it. The State has not commenced a separate action under CERCLA nor has it sought to intervene in this one.[17]

▪ This does not mean that non-parties cannot participate in the settlement of a properly commenced action.[18] To the con-

---

**17.** The State has not even informally presented its position on the proposed settlement to the Court.

**18.** It is apparent that non-parties have participated in court approved settlements and, indeed, have done so in at least two reported CERCLA cases. In *O'Neil v. Picillo,* 682 F.Supp. 706 (D.R.I.1988), the State of Rhode Island sued 35 defendants who were allegedly responsible for creation of a hazardous waste site. On the

scheduled first day of trial, the State and the Environmental Protection Agency, a non-party, settled with all but 5 of the defendants. The settlement totaled 5.8 million dollars with 25% going to the State and 75% going to the EPA.

In *United States v. Seymour Recycling Corp.,* 554 F.Supp. 1334 (S.D.Ind.1982), the United States sued various parties allegedly responsible for the creation of hazardous waste site in Seymour Indiana. The Government later amended the complaint to assert claims under CERCLA

trary, in the Court's view, the contemporaneous settlement of the State's claims along with the City's claims is all to the good. The ideal settlement in this case, or in any case, would resolve the claims of all existing and potential plaintiffs and defendants. To the extent that the Judgment reflects a comprehensive resolution of the settling defendants' liability to the state as well as the City, it weighs in favor of approval of the Consent Judgment. But by its own choice the State's claims are incidental or ancillary to the claims between the litigants before me and it is with respect to the latter claims and those claims alone that I will "declare the law."

The Court recognizes that the settling companies want to depart from this case with assurances that they have paid for peace on all fronts. But if the parties structured the settlement in its present form solely to ensure the settling companies complete contribution protection—in effect to guarantee that the Judgment and Consent Order allows them to fully and finally close the book on this matter—that issue can resolved to the settling companies' satisfaction without regard to the larger question of whether section 113(f)(2) applies to the settlement. As discussed above, cases decided before and after the effective date of SARA have held that the UFCA applies to CERCLA settlements. *See Conservation Chemical, Hines Lumber Co.,* and *Lyncott Corp., supra.* None of the objecting parties have argued that the settlers should not be protected from contribution claims. They simply object to the possibility, apparently contemplated by

the express language of section 113(f)(2), that they will have to make up the settlers' shortfall in this action or in an action commenced by the State without a commensurate right to force the settlers to shoulder their fair share. Lest there be any doubt, I adopt the reasoning of *Conservation Chemical* and conclude that if § 113(f)(2) does not govern the City's settlement, the settling companies are still entitled to contribution protection from other potentially liable parties.[19]

c) Procedural Objections.

■ Although Clairol's procedural objections are premised on the assumption that the Court is being asked to approve the Consent Order, I will assume that the objections stand with respect to the City side of the Judgment in light of my conclusion that the City is entitled to proceed as a "State" pursuant to section 113(f)(2). In support of its contention that the Court must review the proposed Judgment in the context of a hearing preceded by public notice and discovery, Clairol relies, in part, on the procedures followed in *United States v. Pepper's Steel and Alloys, Inc.,* 658 F.Supp. 1160 (S.D.Fla.1987); *United States v. Conservation Chemical Co.,* 628 F.Supp. 391 (W.D.Mo.1985); *United States v. Hooker Chemical & Plastics Corp.,* 607 F.Supp. 1052 (W.D.N.Y.1985), *aff'd,* 776 F.2d 410 (2d Cir.1985); and *United States v. Seymour Recycling Corp.,* 554 F.Supp. 1334 (S.D.Ind.1982). In each case, Clairol asserts, the CERCLA claims being settled[20] were fully disclosed and known long

and add 24 new defendants. On the same day the Government filed the amended complaint, the State of Indiana and the County of Jackson moved to intervene, and the Government, the State, the County, the City of Seymour, the Board of Aviation Commissioners of Seymour, Indiana, and the 24 new defendants filed a proposed Consent Decree with the Court. Several of the non-party settlers participated in the hearings held on the adequacy of the settlement, and the consent decree incorporated the non-party local governments' covenants not to sue.

Some of the defendants have cited *United States v. Wade,* 577 F.Supp. 1326 (E.D.Pa.1983), as a case involving non-party participation in a CERCLA settlement. Although by no means clear, there is some suggestion that the settle-

ment discussed in *Wade* was reached entirely outside the context of the litigation.

19. Section 113(f)(1) provides that CERCLA contribution claims "shall be governed by Federal Law" and resolved "using such equitable factors as the court determines are appropriate."

20. Strictly speaking, *Hooker,* 607 F.Supp. 1052, was not a CERCLA case. In the original complaint, the Environmental Protection Agency ("EPA") asserted claims under several other environmental statutes for the purpose of remedying the dangerous conditions at a hazardous waste site in upstate New York. *Id.* at 1053, 1055. EPA later moved to add claims under CERCLA but the case settled before the motion was decided. *Id.* at 1056.

prior to the settlement; the proposed settlement was the product of extensive negotiations in which all parties to the litigation actively participated; notice of the proposed settlement was given to the public via publication in the Federal Register; the comments and views of non-parties to the lawsuit were actively solicited; and in all cases except for *Pepper's Steel* where the settlement was unopposed, hearings were conducted at which various experts were called to testify, subject to cross-examination, concerning the fairness and adequacy of the settlement.

Preliminarily, I note that Clairol simply mischaracterizes some of the procedures followed in these cases. For example, contrary to Clairol's assertion, the claims in these cases were not all fully disclosed and known long prior to the settlement. In *Seymour,* the original complaint was filed in 1980 but was not amended to add a CERCLA claim, as well as 24 new defendants, until October 26, 1982—the *same day* the proposed consent decree was filed with the court. *Id.* at 1335–36. In addition, the consent decree before the court in *Seymour* was not, as Clairol asserts, the product of extensive negotiations in which all parties participated, but was an arrangement worked out between certain of the defendants, the Government, and several non-parties. *Id.*

As in *Seymour* it appears that the settlement negotiations in *Conservation Chemical* did not involve all of the parties and, in fact, several of the defendants objected to the proposed settlement. *Id.* at 395. It is true that notice of the proposed settlement was given to the public through the Federal Register, and the comments of non-parties were actively solicited, but Clairol fails to mention that those procedures were followed pursuant to Department of Justice regulations which govern consent judgments involving the United States. *Id.* at 399; *see* 28 C.F.R. § 50.7. Nothing in CERCLA suggests that identical or even similar public notice obligations are imposed on other categories of plaintiffs.

The fact remains that three of the four courts called upon to approve CERCLA settlements did conduct what appear to have been fairly extensive evidentiary hearings. What distinguishes those cases from the case at bar, however, are the terms of the settlements. Unlike the present case, the courts in *Seymour, Hooker,* and *Conservation* were called upon to determine the adequacy of extensive, long-term response plans over which the courts might have been exercising continuing jurisdiction. *See Conservation Chemical* 628 F.Supp. at 394 (hearing held to determine the appropriateness of the *remedy* provisions of preliminary settlement agreement); *Hooker Chemical* 607 F.Supp. at 1057 (hearing held on remedial plan to determine if it was consistent with congressional intent); *Seymour* 554 F.Supp. at 1337 (hearing held on settlement involving surface cleanup plan for contaminated site). Here, the settlement terms involve only the payment of money which in no way restricts the ability of the City or the State to select an appropriate response plan for the landfills.[21]

To the extent that any response plan for the landfills must conform to CERCLA standards, including public notice, review and criticism, the plan cannot logically be scrutinized until it exists. When a plan is proposed, it will be subject to whatever review CERCLA requires. *See, e.g.,* section 113(k), 42 U.S.C. § 9613(k) (EPA response actions must be based on an administrative record made available to the public at or near the facility at issue and remedial action plans must be developed with the participation of potentially affected persons); section 117, 42 U.S.C. § 9617 (establishing procedures for public participation in development of remedial action plan undertaken by EPA by a State or by any other person pursuant to cooperative agreement, abatement order, or consent judgment); section 121, 42 U.S.C. § 9621 (establishing standards for EPA remedial action plans).

---

**21.** *O'Neil v. Picillo,* 682 F.Supp. 706, is silent on the procedures, if any, used to review the mone-

tary settlement in that case.

Although applicable to federal settlements only, section 122, 42 U.S.C. § 9622 strongly supports the view that settlements involving monetary payments only are to be reviewed with lesser stringency than those involving response activity. Section 122 addresses three types of settlements: (1) clean-up agreements; (2) so called *de minimis* settlements involving only a minor portion of the subject response costs; and (3) cost recovery settlements. The only type of settlements subject to mandatory judicial review under section 122 are those involving clean-up agreements. The two categories of money settlements can be effected through administrative orders subject only to a 30 day public notice and comment period. Tellingly, section 122 contains no requirement that proposed money settlements be reviewed via an evidentiary hearing, let alone that interested parties be allowed to conduct discovery before such a hearing.

Nor would such procedures be required if, as Clairol suggests, the Court reviewed the proposed settlement .under the standards governing class action settlements pursuant to Fed.R.Civ.P. 23(e).[22] In *City of Detroit v. Grinell Corp.*, 495 F.2d 448 (2d Cir.1974), several members of the plaintiff class in a private antitrust action appealed the district court's approval of a settlement agreement. The appellants contended, *inter alia*, that they should have been afforded an opportunity, through discovery, to develop facts which might have had some bearing on the district court's inquiry. The appellants sought discovery of data on class damages without which, they argued, the lower court could not make a competent evaluation of the settlement offer.

Because there were already sufficient facts before the court to approve the settlement and, further, because the opponents had access to those facts, the court rejected appellants' contention that they were entitled to discovery before the settlement was approved:

> Appellant's claim that there was a need for further discovery to develop the facts falls flat in view of the extensive evidentiary base already available at the document depository.

*Id.* at 463. In response to appellants' assertion that it was incumbent upon the proponents of the settlement to produce the factual material supporting it, the Court stated:

> [Counsel for appellants] apparently feels that he may sit back and request the production of documents that have already been produced—documents with which he may be unfamiliar simply because he entered the litigation when it was already in an advanced stage. In general the position taken by the objectors is that by merely objecting, they are entitled to stop the settlement in its tracks, without demonstrating any factual basis for their objections, and to force the parties to expend large amounts of time, money and effort to answer their rhetorical questions, notwithstanding the copious discovery available from years of prior pre-trial proceedings. To allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process.

*Id.* at 464. Clairol's failure to familiarize itself with the record in this case is less justified than that of the dissenting class members in *Grinell*. Clairol actively supported the severance and stay of the third-party actions in this case which, among other things, protected Clairol from the expenses, burdens, and intrusions inherent in litigation of this kind. At the same time, however, Clairol was not precluded from

---

**22.** Before a proposed class action settlement can be approved, all members of the class must be notified of the proposal, and the proponents of the settlement must demonstrate that it is fair, adequate, and reasonable. 3B Moore, Moore's Federal Practice para. 23.80 (2d ed. 1987). Since absent class members will be bound by the settlement terms negotiated by representative parties, the court in reviewing a class action settlement functions as a fiduciary for absent class members. *In re Warner Communications Securities Litigation*, 798 F.2d 35 (2d Cir.1986); *Grunin v. International House of Pancakes*, 513 F.2d 114 (8th Cir.) *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

keeping abreast of ongoing discovery, albeit at a price. Having chosen, despite its awareness that settlement among the original parties was contemplated and encouraged by the Court, to ignore the ample evidentiary record until the last moment, Clairol will not now be permitted to delay and possibly endanger the settlement based on its self-imposed ignorance.

Clairol's insistence on an evidentiary hearing also runs contrary to the standards governing class action settlements. In reviewing a proposed class action settlement, a court must have "before it sufficient materials to evaluate the settlement and [come] to the correct conclusion." *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982). If so, "an evidentiary hearing is not required unless the objectors raise 'cogent factual objections to the settlement.' " *Malchman v. Davis,* 706 F.2d 426, 434 (2d Cir.1983). *See also, In Re Agent Orange Product Liability Litigation,* 597 F.Supp. 740, 760 (E.D.N.Y.1984) (evidentiary hearing not required before approval of class action settlement). Here, the objectors have offered no more than generalized assertions that the record before the Court is insufficient.

 The question then is not whether the Court disregarded any bright line procedural rules governing CERCLA settlements—there are none—but whether the procedures chosen provide the Court with sufficient information to intelligently evaluate the settlement. This question, in turn, cannot be adequately addressed without first considering the Court's role in reviewing a CERCLA settlement. Before approving a CERCLA settlement, the Court must be convinced that it is fair, adequate, and reasonable, and consistent with the Constitution and the mandate of Congress. *Conservation Chemical,* 628 F.Supp. at 400; *See also Hooker Chemical,* 607 F.Supp. at 1057.[23] In making this determination, the reviewing court should consider "the strength of the plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in litigation if the settlement is not approved." *United States v. Hooker Chemicals and Plastics Corp.,* 540 F.Supp. 1067, 1075 (W.D.N.Y.1982). "The underlying purpose of the court in making these inquiries is to determine whether the decree adequately protects the public interest." *Conservation Chemical,* 628 F.Supp. at 400.

In assessing the various factors enumerated above, however, the Court's role is not unlimited. Settlements are to be encouraged and the court does not "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute." *Grinnell* 495 F.2d at 456. And "where there has been arms length bargaining among the parties [and] sufficient discovery has taken place to enable ... counsel to evaluate accurately the strengths and weaknesses of the plaintiff's case ... there is a presumption in favor of the settlement," *Wellman v. Dickinson,* 497 F.Supp. 824, 830 (S.D.N.Y.1980), *aff'd,* 647 F.2d 163 (2d Cir.1981), particularly where "a government agency committed to the protection of the public interest" has participated in and endorsed the agreement. *Id.* Finally, in addition to the general federal policy favor-

---

**23.** These cases predate the enactment of SARA but the House Judiciary Committee comments on section 113 appear to endorse the standard of review set forth in the pre-SARA cases. The Judiciary Committee noted that an earlier version of section 113(f)(2) expressly conditioned the favorable contribution rights of the section on "judicially approved good faith settlement," but the words "good faith" were eventually deleted from the statute because:

> [t]he amendment recognizes that judicial examination and approval of the settlement itself is adequate to protect against improper or "bad faith" settlements. Before initially approving a consent decree under CERCLA, a court must satisfy itself that the settlement is *reasonable, fair, and consistent with the purposes the CERCLA is intended to serve.* Because this process ensures that the "good faith" of the settlement is examined by the court, a supposedly separate requirement of good faith in the contribution section would lead to unnecessary confusion, would cast doubt on the availability of contribution protection under the section, and would lessen the incentive for settlement created by such protection.

(emphasis added). H.R.Rep. No. 253(III), 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 3038, 3042.

ing settlements, *see Florida Trailer & Equipment Co. v. Deal,* 284 F.2d 567, 571 (5th Cir.1960), the reviewing court must be mindful that Congress, in enacting the 1986 amendments to CERCLA sought to "expedite effective remedial actions and minimize litigation." Section 122(a).

▮▮▮ The balance to be struck between the policies favoring settlements and the need to safeguard the public interest in cases of this type was best summarized in *United States v. Carrols Development Corp.,* 454 F.Supp. 1215 (N.D.N.Y.1978):

> It is not the Court's function to determine whether this is the best possible settlement that could have been obtained but rather the Court's duty is to determine "whether the settlement is within the reaches of the public interest." *Id.* at 1222 (quoting *United States v. Gillette Company,* 406 F.Supp. 713, 716 (D.Mass.1975).

*Id.* at 1222. The record before the Court provides a sufficient basis to make this determination.

First, it is clear that the settlement was entered into in good faith. As the moving parties' affidavits demonstrate, the settlement is the product of arms length negotiations, extending over the course of approximately one year, between the City, the State, and the settling companies. In addition to the Corporation Counsel and the defendants, the Judgment has been independently reviewed and approved by the Commissioner of the Department of Sanitation and the State Comptroller. Neither Clairol nor Exxon have come forward with any evidence, or even conclusory statements, casting doubt on the good faith of the settling parties, and the record in this case attests to the adverserial vigor with which the settling parties have otherwise approached this litigation.

It is also clear that the settling parties had a sufficient factual record upon which to reach an informed decision about settlement terms. Indeed, more than three years of discovery has produced a voluminous evidentiary record in this case. That record, consisting of hundreds of thousands of documents and approximately eighty depositions, includes information concerning the business transactions between the settling defendants and the waste-hauling companies; the volume and nature of the wastes disposed of at the landfills; the use of the city's landfills by the waste hauling companies; and environmental conditions at the landfills.

On the basis of preliminary data concerning environmental conditions at the landfills and NYSDEC's regulatory requirements for the remediation of hazardous waste sites, the settling parties and the State have estimated that remediation would cost approximately $400,000,000. Against this figure, the settling parties had to consider the formidable risks and expenses of continuing litigation. Of principal importance in this regard is the City's concession that, as the owner and operator of the landfills and as a possible generator and transporter of hazardous substances, the City is itself potentially liable under CERCLA. Indeed several defendants, including Exxon, have argued that the City is *solely* responsible for any releases of hazardous substances from the landfills. In addition, the defendants have raised doubts about the City's ability to prove that any significant amount of their wastes ended up in the 5 City landfills.[24] Nonetheless, the settling companies are willing to settle because of the inherent risks of continued litigation, and because a "victory" after protracted litigation may prove to be more expensive than settlement.

In light of the arguable weaknesses in the City's case, the proposed settlement is clearly in the public interest and consistent with CERCLA. The immediate public benefit is the availability of $13,798,472 for cleanup and remediation costs which might otherwise be drawn from public coffers. That figure does not reflect the money the City will save by not having to prosecute possibly fruitless claims against the settling companies. These benefits will, of

---

**24.** According to settling defendants American National Can, Ford Motor Company, BASF Corporation, Borg–Warner Corporation, and Koppers Company, Inc., a substantial portion of the defendants' wastes ended up at locations other than the 5 City landfills. Memorandum of Five Settling Defendants in Support of the Entry of Consent Judgment at 4.

course, be amplified if the present settlement encourages some or all of the remaining defendants to resolve the case through negotiation rather than expensive, risky, and protracted litigation.

Finally, the Court is satisfied that the settlement is fair to the remaining defendants. Initially, the fact that only a fraction of the more than 300 remaining defendants have voiced objections to the settlement is strong evidence of its fairness. *See Grinell,* 495 F.2d at 462; *Agent Orange,* 597 F.Supp. at 762. Additionally, there is no suggestion in this case that the City or the State is favoring some defendants at the expense of others. Neither Exxon nor Clairol has refuted the settling parties assertion that the City is prepared to offer all of the non-settling parties a settlement at the same "price-per-gallon" as that offered to the settling companies. Furthermore, the settling defendants have agreed to forgo all claims against any of the remaining parties notwithstanding section 113(f)(2) which, if applicable, allows settling defendants to retain contribution rights against non-settlers. And, despite Clairol's complaint that settlement pursuant to section 113(f)(2) immunizes the settling companies from future contribution actions, Exxon itself has asserted that the settling companies are protected from contribution actions under *all* potentially applicable contribution frameworks. To the extent that the non-settling parties are disadvantaged in any concrete way by the applicability of section 113(f)(2) to the overall settlement, their dispute is with Congress.

In conclusion, the Judgment in its present form is unacceptable because it incorporates the Order on Consent. In all other respects the Court concludes that the Judgment is fair, adequate, and reasonable, and consistent with the Constitution and CERCLA. The settling parties may submit for the Court's approval an amended version of the Judgment that is in accord with this opinion.

SO ORDERED.