The CITY AND COUNTY OF DENVER,
et al., Plaintiffs,

v.

ADOLPH COORS COMPANY,
et al., Defendants.

Civ. A. No. 91–F–2233.

United States District Court,
D. Colorado.

Feb. 24, 1993.

See also 813 F.Supp. 1476.

Daniel E. Muse, T. Shaun Sullivan, Steven J. Coon, Asst. City Attys., Russell E. Yates, Carolyn L. Buchholz, Katherine L. Letson, Patton, Boggs & Blow, P.C., Robert S. Treece, Daniel S. Maus, Treece, Alfrey & Musat, P.C., Denver, CO, P.B. ("Lynn") Walker, Region Environmental Counsel, Englewood, CO, for plaintiffs.

John R. Jacus, Russell Carparelli, Bradley, Campbell, Carney & Madsen, Golden, CO, Monte Pascoe, Tucker K. Trautman, Margaret Toal–Rossi, Ireland, Stapleton, Pryor & Pascoe, Elizabeth H. Temkin, Mark J. Gilbert, Ballard, Spahr, Andrews & Ingersoll, Steven J. Dawes, Cheryl A. Martin, Greengard Senter Goldfarb & Rice, Timothy R. Gablehouse, Gablehouse, Epel and Babich, John D. Faught, Randy L. Sego, John Faught & Associates, Thomas C. Reeve, Bennington and Reeve, P.C., Philip E. Johnson, Neil McClain, Dona V. Maloy, Mosley, Wells, Johnson & Ruttum, P.C., Robert T. McAllister, Kathryn Haight Meyer, Martin McAllister & Murphy, P.C., Denise S. Maes, Steven G. Barringer, A. Bruce Jones, Holland and Hart, John W. Madden, III, Susan Fuller, Madden & Associates, William R. Marsh, Marilyn S. Chappell, McKenna & Cunio, Louis Marucheau, AMAX Research & Development, Inc., Golden, CO, Arthur H. Bosworth, II, Cathy A. Klein, Bosworth & Kelly, P.C., Hugh Q. Gottschalk, Elizabeth Savage, Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Joel W. Cantrick, Pendleton & Sabian, P.C., Denver, CO, for defendants.

## ORDER REGARDING APPROVAL OF SETTLEMENTS: 1993–5

SHERMAN G. FINESILVER, Chief Judge.

This is a case involving environmental contamination at the Lowry Landfill Site ("Lowry" or "the Site"), operated at various times by Plaintiffs City and County of Denver ("Denver"), Waste Management of Colorado, Inc. ("WMC"), and Chemical Waste Management, Inc. ("CWM"). This matter comes before the Court on Plaintiffs' Motion for Approval of Settlements, filed October 20, 1992. Jurisdiction is based upon 28 U.S.C.A. § 1331 and 42 U.S.C.A. §§ 9601 and 9607. The litigants have fully briefed the issues. For the reasons stated below, the motion is GRANTED in PART.

### I. Background

Lowry, located 20 miles southeast of Denver, was listed on the CERCLA National Priorities List ("NPL") on September 21, 1984, as a hazardous waste site. 49 Fed.Reg. 37,070 (1984). Plaintiffs, all current or former operators of Lowry, seek damages from numerous alleged generators and transporters of the hazardous waste under sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "Superfund"). 42 U.S.C.A. §§ 9601 et seq. (West 1983 & Supp. 1992). Plaintiff Denver also alleges certain common law causes of action.

The Lowry Landfill was owned and operated by the United States beginning in the early 1940s. On July 15, 1964, the United States conveyed the site to Denver by quitclaim deed with the condition that the site be used as a landfill at least until 1984. Denver operated the site from 1964 to 1980 as a regional industrial and municipal waste site.

On July 7, 1980, CWM executed a contract with Denver to operate the site and WMC operated the site from August 12, 1980 until August 3, 1990. Denver, CWM, and WMC

claim that they have incurred and will continue to incur response, cleanup, and remediation costs. Defendants are entities alleged to be either generators or transporters of hazardous wastes to Lowry. Most defendants have been identified by the Environmental Protection Agency ("EPA") as potentially-responsible parties ("PRPs") at the Lowry Landfill site pursuant to 42 U.S.C.A. § 9607(a) (West 1983 & Supp.1992).

Following years of failure by the Environmental Protection Agency ("the EPA") to effectuate settlement with Lowry PRPs, Plaintiffs diligently worked out settlements with 119 PRPs totalling over 24 million dollars. In the motion before the Court, Plaintiffs have applied for an order (1) approving the settlements, (2) barring claims against the settlors for contribution or response costs, except as provided for in the settlement agreements ("the Agreements"), and (3) declaring that the nonsettlor's share of liability is reduced by the amount paid by the settlors for their volumetric share of the remedial costs at the Site.

The settlements executed by Plaintiffs fall into three categories: *de minimis*, mid-tier, and one agreement with John Todd, Inc. based on the corporation's inability to pay. A *de minimis* PRP had to meet the same four criteria as required in the EPA's *de minimis* settlements: (1) the PRP's § 104(e) response was adequate and complete; (2) the PRP's volumetric contribution of waste was 300,000 gallons or less; (3) the PRP was not involved in any litigation against EPA concerning the Site; and (4) the PRP's waste stream was not significantly more toxic or of greater hazardous effect than other waste streams at the Site. Defendants who failed to qualify for *de minimis* status were classified as either mid-tier or high-tier, depending upon their volumetric contribution.

Each of the settlements contained up to five key components. The first component is the estimated cost of the remedy. An estimated cost of the remedy was agreed to by the parties for purposes of negotiations and then reduced by 20 percent to account for Plaintiffs' share of the remedial costs. The estimated cost of the remedy used in the *de minimis* agreements—$500 million—was greater than that for the mid-tier agreements—$310 million—because the mid-tier settlements anticipate a remedial cost reopener that potentially subjects mid-tier settlors to greater liability. All settlements were based on an estimated cost of the remedy greater than the estimate offered by the nonsettling defendants. Therefore, the settlors paid a greater amount—and the nonsettlors will be credited a greater amount—than if the nonsettlors' estimate had been used.

The second and most important component represents the settlors' volumetric contribution of waste containing hazardous substances at the Site. To determine a PRP's volumetric contribution of waste to the Site, the parties relied on a thorough and continually updated EPA study entitled "Protocols for Identifying and Determining Volumetric Contribution for Lowry Landfill (§ 6)." Each settlor's volumetric waste contribution taken as a percentage of all waste at Lowry was then multiplied by the total estimated cost of the remedy (less Plaintiffs' 20 percent) to arrive at the settlor's estimated share of the remedy.

The third component, for *de minimis* settlements only, is a cost overrun premium paid by settlors in addition to the payment for their volumetric share. The cost overrun premium allows parties to settle with finality their liability at the Site without regard to cost overruns. In exchange for bearing the risk of cost overruns, Plaintiffs are protected against unanticipated increases in the cost of the remedy based on regulatory and other changes. The mid-tier settlement equivalent of the third component, due to the larger payments involved, is a reopener clause that allows the parties to revisit the Agreements in the event the actual cost of remedy exceeds the estimated cost.

The fourth component of some settlements was for optional premiums the settlor could pay in consideration for Plaintiffs' agreement to assume certain additional obligations, most of which are unrelated to response costs or other cleanup of the Site. The greater the assumed obligation premium a settlor was willing to pay, the more potential future obligations of the settlor Plaintiffs were willing

to assume. The optional assumed obligation premium was also offered to the settlors in order to afford greater finality in the liability associated with Site litigation.[1]

The fifth and final component consists of two separate provisions regarding the parties' attempts to address both the uncertainty of current information and the inability to pay of other PRPs. First, a standard "new information" reopener such as that used by the EPA is incorporated in all *de minimis* and mid-tier settlements. To protect Plaintiffs against the possibility that a settlor's full waste contribution to the Site had not been discovered at the time or settlement, Plaintiffs may collect additional monies if new information comes to light indicating that a settlor contributed a greater volume of waste. Second, because CERCLA recognizes that a PRP may be jointly and severally liable, Plaintiffs' settlements reflect a proportion of response costs attributable to bankrupt or financially insolvent PRPs. This portion is referred to as an "orphan share." The *de minimis* settlements incorporate an orphan share of 20 percent. Early settlement proposals offered an orphan share of five percent to encourage settlement; later settlements included a 30 percent volumetric orphan share.

## II.

█ The plaintiffs in this case urge us to affirm a bar on any nonsettlors' suits for response cost contribution against the settlors.[2] Plaintiffs ask that we apply either 42 U.S.C. § 9613(f)(2) (CERCLA § 113(f)(2)) or the Uniform Contribution Among Tortfeasors Act § 4, 12 U.L.A. 98 (1975) ("UCATA") to bar future claims for response cost contribution. Plaintiffs also ask that we employ the UCATA approach by crediting Defendants with the amount the settlors are paying, rather than with their equitable share of waste.

### A. Contribution Bar

Section 113(f)(2) states:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable parties unless its terms so provide, but it reduces the potential liability of others by the amount of the settlement.

Section 4 of the UCATA states, in relevant part:

When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

.    .    .    .    .

(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.

Plaintiffs cite two reasons for the Court to apply section 113(f)(2): first, that political subdivisions of states, such as the City and County of Denver, may be considered "states" for the purposes of section 113(f)(2); and second, the section should effectively apply even to solely private settlement agreements both as a matter of public policy and pursuant to the UCATA.

### 1. Municipalities, Private Parties, and Section 113(f)(2)

█ The legislative history of CERCLA is not very helpful in resolving the issue of whether a city may be a "state" under CERCLA § 113(f)(2). In *City of New York v. Exxon Corp.*, 697 F.Supp. 677 (S.D.N.Y. 1988), the Court rigorously analyzed CERCLA's statutory language, concluding that

---

1. The equation for computing settlement amounts for individual PRPs was as follows:

Settlement Amount = Estimated Cost of Remedy × .80 × (Settlor's Volumetric Waste Contribution/Total Waste at Site) + Cost Overrun Premium + Assumed Obligations Premium

2. Plaintiffs' original motion requested a bar to claims "against the settling parties for contribution or response costs." It was therefore unclear whether Plaintiffs intended to bar types of contribution costs other than response costs. However, Plaintiffs' reply brief explicitly maintains they are requesting a bar merely against response costs.

Congress did not intend for its listing of "United States or a State" in CERCLA § 113(f)(2) to be exclusive of cities.[3] We agree.

Defendants point out that few of the Agreements, if any, appear to have been actually signed by the City and County of Denver, and thus any ruling that Denver can be a "state" under CERCLA § 113(f)(2) would not dispose of the issue of whether a bar order is appropriate here. Plaintiffs respond by noting that Denver is a plaintiff in this case, and it approved and agreed to be bound by all the settlements. We agree that, insofar as Denver has agreed to be bound by the settlement agreements, it has as much of a relevant relationship with them as if it had signed them.

■ We also agree that to deny the section 113(f)(2) bar to the city would be "unduly formalistic" and contrary to the remedial purpose of CERCLA. *Id.* at 685–86. "CERCLA is essentially a remedial statute designed by Congress to protect and preserve public health and the environment. [Courts] are therefore obligated to construe its provisions liberally to avoid frustration of the beneficial legislative purposes." *Id.* at 685, *quoting Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1081 (1st Cir.1986). Contribution protection for those who settle with a municipality advances CERCLA's remedial purposes by encouraging early and complete settlements. *Exxon Corp.,* 697 F.Supp. at 685.

Public policy considerations, combined with the independent backdrops of the UCATA and the Uniform Comparative Fault Act, 12 U.L.A. 44 (West Supp.1992) ("UCFA") (both of which provide for contribution bars), compel the conclusion that both cities and private parties should be eligible for contribution protection in environmental cleanup cases. *Allied Corp. v. Acme Solvent Reclaiming, Inc.,* 771 F.Supp. 219, 222–23 (N.D.Ill.1990) (applying section 113(f)(2) to private settlements as matter of public policy). Were we

to allow contribution claims against settling PRPs, the purposes of CERCLA would not only fail to be served, but would be thwarted. We do not find section 113(f)(2) inconsistent with contribution bars for city and private party plaintiffs; on the contrary, although section 113(f)(2) does not itself provide authority for private-party contribution bars, such bars are clearly in keeping with the spirit of both facilitating settlement as well as CERCLA.

■ CERCLA has two primary purposes: (1) to achieve the prompt cleanup of hazardous waste sites and (2) to impose the cost of the cleanup on those responsible for the contamination. *U.S. v. Rohm & Haas Co.,* 721 F.Supp. 666 (D.N.J.1989); *State of Colorado v. ASARCO,* 608 F.Supp. 1484, 1491 (D.Colo. 1985). It is clear that settlement is consistent with the purpose of CERCLA. *Acushnet River & New Bedford Harbor,* 712 F.Supp. 1019, 1027 (D.Mass.1989). Courts have a strong interest in promoting all types of settlement. *Metropolitan Housing Dev. Corp. v. Arlington Heights,* 616 F.2d 1006, 1013 (7th Cir.1980); *Allied Corp.,* 771 F.Supp. at 222. In fact,

> [t]his interest is especially pronounced in complex matters such as CERCLA claims, where the amount of evidence to be gathered for assessing liability is voluminous. It is hard to imagine that any defendant in a CERCLA action would be willing to settle if, after settlement, it would remain open to contribution claims from other defendants. The measure of finality which a cross-claim bar provides will make settlements more desireable.

*Id.*

Accordingly, the settlement agreements will be approved with a bar against response cost contribution claims by nonsettling parties against settlors.[4]

**B. Amount Paid versus Equitable Share**

■ The second issue before the Court is whether to credit the nonsettling defendants,

---

**3.** While the Court in *City of New York* also noted the *State* of New York had given the settlements its approval, the Court did not rely on the fact.

**4.** Defendants have been denied access to certain provisions in the Agreements. Defendants protest that the Court cannot approve a bar order affecting their rights in ways unknown to them.

Defendants are correct in their conclusion, but their premise is flawed. The information Plaintiffs seek to keep confidential does not affect Defendants' rights in any way whatsoever. The contribution bar, the only provision in the Agreements affecting Defendants' rights, is one of which Defendants have full knowledge.

under the UCATA,[5] with the amount paid by the settlors or, under the UCFA, with the equitable share of waste represented by the settlors.[6] The question may be largely academic because it appears in this case as if the amount paid and the equitable share are the same thing. We note that under the common interpretation of "equitable share," the Agreements are equitable in that they reduce Defendants' liability by the settlors' volumetric share of waste: the settlement payments were based on the settlors' volumetric share. Defendant Amax's theory of 'equity,' however, holds that the Court, at trial, should attempt to measure the relative toxicity, and thus harmfulness and cost to the environment, of the differing types of waste. Amax believes its waste streams, while greater in volume, are relatively less toxic and harmful to the environment than those of many of the settlors.[7] Amax therefore maintains that allowing settlors to pay remedial costs based on their volumetric share unfairly reduces their true liability while artificially inflating Amax's.

Amax then embarks on a lengthy argument for rejecting the amount paid approach in the UCATA for the proportionate share approach of the UCFA. However, Amax can cite no case law suggesting that proportionate share must be based on relative toxicity; the cases cited by Amax argue for nothing more than what the Agreements already do. In other words, Amax argues for the proposition that the nonsettlors' liability should be reduced by the settlors' "equitable share" of liability without explaining why that equitable share is anything other than proportionate volume. Yet, because the settlement amounts are *based on* the common understanding that proportionate share is measured by proportionate volume, either the UCATA or the UCFA could be applied to the Agreements with the same result for the nonsettlors.

However, to the extent that it does or may matter, we believe the UCFA is inconsistent with the intent of Congress and the purpose of CERCLA. *See, e.g., Rohm & Haas Co.,* 721 F.Supp. at 677; *U.S. v. Pepper's Steel and Alloys, Inc.,* 658 F.Supp. 1160, 1168 (S.D.Fla.1987); *U.S. v. Cannons Engineering Corp.,* 899 F.2d 79, 92 (1st Cir.1990). CERCLA's section 113(f)(2) provides that the liability of nonsettlors is to be reduced "by the amount of the settlement." The language "indicates that Congress made a conscious choice in 1986 not to adopt UCFA principles for CERCLA purposes." *U.S. v. Cannons Engineering Corp.,* 720 F.Supp. 1027, 1048 (D.Mass.1989). Instead, Congress adopted the approach taken in section 4 of the UCATA, which states:

> When a release or covenant not to sue or not to enforce judgment is given in good faith to one or two or more persons liable in tort for the same injury or the same wrongful death:
>
> (a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it *reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount stipulated by the release or the covenant, or in the amount of the consideration paid for it,* whichever is greater; and
>
> (b) It discharges the tortfeasor to whom it is given all liability for contribution to any other tortfeasor.

(emphasis added).

Furthermore, just as a settlement allowing subsequent contribution suits would be no

---

5. The UCATA § 4 states, in relevant part:
   When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death: (a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or covenant, or in the amount of consideration paid for it, whichever is the greater ...

6. Under the UCFA, when any plaintiff settles with less than all of a group of joint tortfeasors, the liability of the nonsettling defendants is reduced by the settlors' *proportionate share of liability,* rather than by the amount paid by the settling defendants.

7. This argument was essentially rejected by the EPA. The EPA made a statutory determination that the waste of the *de minimis* settlors is no more toxic than the waste of any other PRP.

settlement at all, neither would the possibility of settlors going to trial to determine their comparative fault. This is especially true in the area of environmental contamination, where such a trial in a large case is likely to consist of weeks or months of speculative testimony, all from experts, regarding the relative toxicity of waste produced by both the litigating parties *and those parties that have ostensibly settled their liability.*[8] It is evident that such a system would provide a disincentive to any settlement whatsoever, to the detriment of a cost-effective and speedy remediation of the environment.

CERCLA's section 113(f)(1) provides that CERCLA contribution claims "shall be governed by Federal Law" and resolved "using such equitable factors as the court determines are appropriate." If a court believes in the idea of environmental settlements, then the court must exercise its equitable power to approve settlement agreements that actually result in matters being settled. *See, e.g., Edward Hines Lumber Co. v. Vulcan Materials Co.,* 1987 WL 27368 (N.D.Ill. Dec. 4, 1987) (approving contribution bar without reference to CERCLA). The principle underlying effective, final settlements must be as true for cities and private parties as it is for states and the federal government: regardless of the status of parties involved in the settlement agreement, we must always remember that the beneficiaries of early settlement are public health and the environment. The Agreements will be approved under the UCATA and the Court's equitable power and Defendants' liability will be reduced by the amount of money paid pursuant to the Agreements.

### III. Response Cost Bar

■ Defendants contend that even if the Court imposes a bar on contribution actions brought by nonsettling parties (a contribution bar does not affect nonparties) against settlors, the bar should not include a bar on *response* costs. It is clear from the language of CERCLA itself that response cost actions are actions for contribution and are thus prohibited by contribution bars. *See* 42 U.S.C.A. §§ 9607(a)(4), 9613(f); *see also Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989) (citing section 9613(f) and holding that when "one liable party sues another to recover its equitable share of the response costs, the action is one for contribution").

Holding response costs subject to a contribution bar is also consistent with CERCLA's encouragement of settlements, outlined above. "The courts have consistently enforced CERCLA by providing settling parties with immunity from any claim ... [that is] in substance a claim for contribution, though the claim may be called something else." *Dravo Corp. v. Zuber,* 804 F.Supp. 1182, 1184 (D.Neb.1992) (holding defendant's section 113(f)(2) settlement barred plaintiff's various common law contribution actions because CERCLA intended to foreclose such claims no matter what they are called); *accord Cannons Engineering,* 899 F.2d at 92 (upholding dismissal of cross-claims for indemnity so as not to "eviscerate § 9613(f)(2) and allow nonsettlors to make an end run around the statutory scheme"); *AKZO Coatings, Inc. v. Aigner Corp.,* 803 F.Supp. 1380 (N.D.Ind.1992) (viewing as barred claims arising from same subject matter as claims barred by section 113(f)(2)); *U.S. v. Pretty Products, Inc.,* 780 F.Supp. 1488 (S.D.Ohio 1991) (dismissing contribution claims under CERCLA and state law claims for indemnity, breach of contract, quasi-contract, quantum meruit, and unjust enrichment); *U.S. v. Alexander,* 771 F.Supp. 830 (S.D.Tex.1991) (imposing sanctions for assertion that " 'a nonsettling defendant may pursue contribution under state law for liability for response costs, notwithstanding the contribution bar provisions of CERCLA' ").

The District Court in *Alexander* stated:

it is inconceivable to this Court that Congress, wanting to encourage parties to set-

---

8. None of the cases applying the UCFA cited by Defendants are as complex as this one. For example, the plaintiffs in *Comerica Bank–Detroit v. Allen Indus., Inc.,* 769 F.Supp. 1408 (E.D.Mich.1991), sought approval of only one settlement agreement. The plaintiffs in *U.S. v.* *Western Processing Co., Inc.,* 756 F.Supp. 1424 (W.D.Wash.1990), sought approval of only 26 settlement agreements. In the matter before us, we are presented with the question of whether to approve 119 settlement agreements that are already based on proportionate volumetric share.

tle early with the Government, would so carefully fashion protections against contribution claims under CERCLA, but then leave those same parties exposed to similar liability by allowing state law contribution schemes to be pursued.

*Id.* at 841.

We believe that a contribution bar under the UCATA should logically operate in the same manner as one under CERCLA. Response costs must also be barred as to the settlors.

## IV. Nonsettlors' Reduction of Liability: Settlement Premiums

■ Defendants urge the Court to credit them with the entire amount of payment given Plaintiffs through the Agreements. Defendants assert that if Plaintiffs are allowed to pocket the cost overrun premiums and assumed obligations premiums, then Plaintiffs will have obtained what amounts to sheer profit at the expense of the environment. We do not believe that such an interpretation properly construes the premiums.

By offering to assume or absorb certain risks in return for the premiums, Plaintiffs are effectively acting like an insurance company. They are performing a task that an outside insurance company could just as well do, and the fact that it is *Plaintiffs* who are doing the insuring does not somehow tie the premiums to environmental cleanup costs. Indeed, it would be unjust to require Plaintiffs to put the premiums—the consideration for Plaintiffs' assumption of risk—toward cleanup, only to have Plaintiffs later expend a like sum in meeting the obligations it assumed in return for the premiums. Simply put, Plaintiffs are entitled to the premiums because Plaintiffs have agreed to assume risks; the payment for environmental damage and the payment for Plaintiffs' agreement to insure against risks are analytically distinct.

However, in light of other rulings in this order, we view premiums relating to response costs as a different matter. We direct that the balance of all premiums relating to response costs be devoted to environmen-

tal remediation or disposed of as may be ordered by the court.[9]

## V.

The Court finds that the Agreements are fair and reasonable. The terms are complete and justifiable. The settlement amounts are based upon objective criteria measuring proportionate share of waste. The settlement amounts are therefore not unfair to nonparties and nonsettling defendants, especially insofar as the settlement amounts are based upon an estimated cost of remedying the Site which is far in excess of that which Defendants themselves propose.

Accordingly, it is ordered that:

(1) Plaintiffs' Motion for Approval of Settlements, filed October 20, 1992, is GRANTED in PART.

(2) The settlements are approved by the Court.

(3) All claims for contribution and response costs by nonsettling parties-defendants against the settling parties-defendants, however denominated, which were or could have been asserted by nonsettling parties-defendants against settling parties-defendants regarding any claim arising out of any of the matters or transactions alleged or referred to in this action, are barred, extinguished, discharged, and satisfied, except as provided for in the Agreements.

(4) No premiums charged by Plaintiffs in the Agreements, except the premiums relating to response costs, shall be credited to nonsettlors. The Court DIRECTS that the balance of all premiums relating to response costs be devoted to environmental remediation or disposed of as may be ordered by the court.

(5) The nonsettling parties' share of liability is to be reduced by the amount paid by the settling parties for their volumetric share of the remedial costs of the Site.

(6) Plaintiffs' Response to January 29, 1993 Minute Order, filed February 5, 1993, is ordered SEALED.

---

9. We note that Plaintiffs, in their Response to January 29, 1993 Minute Order, filed February 5, 1993, have promised to devote the premiums to remedy, subject to certain reasonable conditions.

348

(7) Joining Defendants' Motion for Leave to File a Supplemental Submission to Address Plaintiffs' Response to January 29, 1993 Minute Order, filed February 9, 1993, is GRANTED.

(8) The request to direct production of Plaintiffs' summary of settlements, embodied in Joining Defendants' Supplemental Submission to Address Plaintiffs' Response to January 29, 1993 Minute Order, filed February 9, 1993, is DENIED. The Supplemental Submission is ordered SEALED.